THE STATE *Ex Rel.* THEODORE D. WAGNER, APPELLANT, *vs.* JOHN R. STOLL, COUNTY TREASURER, RESPONDENT.

By an Act passed in 1812, a bank was established "in the name, and for the benefit," of the State. The Act pledged the faith of the State for the support of the bank, and its sixteenth Section provided "that the bills or notes of the said corporation * * * shall be receivable at the Treasury of this State, * * * and by all Tax Collectors and other public officers, in payment for taxes and other moneys due the State." In 1843, a general Act in reference to the duties of officers in the collection of supplies was passed, which provided "that all taxes for the use and service of the State shall be paid in specie, paper medium, or the notes of the specie paying banks of the State." The bank being no longer a specie paying bank, certain of its bills, issued in the years 1861 and 1862, were tendered by the relator in payment of his taxes, to the County Treasurer, who refused to receive the same. On application for a *mandamus: Held*,

1. That, although Section 16 of the Act of 1812 created a contract between the State and the bill holders of the bank, which the former could not constitutionally impair, yet that this protection extended only to such bills or notes of the bank as were issued during the period that the sixteenth Section of the Act remained of force.

2. That it was competent for the Legislature of the State to repeal the sixteenth Section of the Act, and by such repeal to relieve the State from the burthen of the contract in reference to the bills or notes of the bank to be thereafter issued.

3. That the Act of 1843 repealed, by necessary implication, so much of the sixteenth Section of the Act of 1812 as made the bills or notes of the bank receivable in payment of taxes. (a.)

Though repeals by implication are not favored by the Courts, yet effect will be given to an intention to abrogate existing legal provisions where such intention, though not expressed in direct and positive terms, is apparent by a fair and necessary implication.

BEFORE CARPENTER, J., AT CHARLESTON, JULY, 1870.

This was an application to the Circuit Court for a writ of *mandamus*, to compel John R. Stoll, County Treasurer of Charleston County, to receive certain bills of the Bank of the State of South Carolina, issued in the years 1861 and 1862, in payment of taxes due by the relator to the State.

The case, as made by the pleadings, was briefly this:

On December 19, 1812, the Legislature of the State passed an Act entitled "An Act to establish a bank on behalf of, and for the benefit of, the State." It provided that a bank should be established "in the name and on behalf of the State of South Carolina, in the manner and on the conditions" therein set forth, to continue until the 1st day of May, 1835, and it pledged "the faith of the State for the support of the said bank, and to supply any deficiency in the funds specifically pledged, and to make good all losses arising from such deficiency." By Section 16, it was declared "that the bills or notes of the said corporation, originally made payable, or which shall have become payable, on demand in gold or silver coin, shall be receivable at the Treasury of this

(a ) There is a question which might have been, but was not, made in this case, and which may not be unworthy of serious consideration. It is this: Assuming that the Act of 1843 repealed the sixteenth Section of the Act of 1812, then what effect, if any, had the Act of 1852 in restoring that Section to the charter of the bank? The Act of 1852 continued the charter generally, without any exception of the sixteenth Section, or reference to the Act of 1843—which, it should be borne in mind, was a general law, and no part of the bank charter. What, then, was the charter thus continued? or (changing the expression) what was the Act thus re-enacted? Was it the charter—the Act—of 1812, with all its provisions? or was it that charter, or Act, as affected or modified by the Act of 1843? That is the question; and, if it is one of actual intent, then did not honesty and fair dealing require of the Legislature, if it intended that the sixteenth Section should be regarded as expunged from the charter, to say so in express terms, so that the bill holder might not be misled as to his rights? If, however, it is a question of construction, apart from the actual intent, as it probably is, then would it not be just as reasonable—even more so—to hold that the effect of the Act of 1852 was to restore the Section to the charter as it was to hold that the Act of 1843 expunged or repealed it?                    R.

State, either at Charleston or Columbia, and by all tax collectors, and other public officers, in payment for taxes, and other moneys due the State."—8 Stat., 24.

On December, 1833, an Act to recharter the bank was passed, which enacted that an Act entitled "An Act to establish a bank on behalf of, and for the benefit of, the State," passed December 19, 1812, "and all other Acts now of force relating to the conduct and operations of the said bank, be, and they are hereby, re-enacted and continued of force until" the 1st day of May, 1856.— 8 Stat., 67.

On December 19, 1843, a general Act, "prescribing the duties of certain officers in the collection of supplies" was passed, which enacted "that all taxes for the use and service of the State shall be paid in specie, paper medium or the notes of the specie paying banks of the State."—11 Stat., 246.

On December 16, 1852, by an Act entitled "An Act to extend the charter of the Bank of the State of South Carolina," it was provided "that, from and after the expiration of the present charter of the 'said bank,' the same be, and his hereby, extended, until the" 1st day of January, 1871.—12 Stat., 1849.

The tax Acts annually passed by the Legislature often contained directions in reference to the kind of funds in which the taxes of the year should be paid, but the Acts above referred to were all that bore upon the question before the Court.

The relator tendered to the defendant in payment of his taxes, amounting to $4,264.95, bills of the Bank of the State of South Carolina, issued in the years 1861 and 1862. At that time, and for several years before, the bank had ceased to be a specie-paying bank. The defendant refused to receive the bills, and thereupon this suggestion for a *mandamus* was filed.

A rule was issued, returnable July 15, 1870, which, on hearing the return thereto and argument of counsel, was dismissed by the Circuit Judge.

The relator appealed to the Supreme Court.

*Magrath & Lowndes*, for appellant:

Four questions are presented in these cases:

1. Are the bills tendered bills of the bank, within the meaning, intent and letter of the 16th Sec., Act of 1812?

2. If they are such bills, does the Act of 1843 repeal the 16th Sec. of the Act of 1812?

3. If the 16th Sec. of the Act of 1812 is not repealed by the Act of 1843, is the receipt of such bills in violation of, and, therefore, prohibited by, the 14th Amendment to the Constitution of the United States ?.

4. Is such receipt in conflict with the Constitution of the State?

The first objection requires an examination of the Section referred to, and of the bills which have been tendered. If they are not such as are referred to in that Section, the tender is bad.

The Act of 1812 is the charter of the bank. The 16th Sec. requires that " the bills or notes of the said corporation *originally made payable*, or which *shall become payable on demand*, in gold or silver coin," (8 Stat., 24,) shall be received by all tax collectors in all payments for taxes.

In 1857, tax collectors were again directed " to receive taxes and dues to the State *only* in notes of the Bank of the State, or of specie paying banks, or in coin."—12 Stat., 596.

In 1865, and then in 1866, it was provided that the " taxes shall be paid *only* in gold or silver coin, United States Treasury notes, or notes declared to be a legal tender by the Government of the United States, or notes of national banks or bills receivable of the State ; also pay certificates of jurors and constables for attendance on the Courts."—13 Stat., 395.

In 1868, the 16th Section was repealed. [A. A., 1868, p. 22.]

The case of the *Graniteville Co.* vs. *Roper*, 15 Rich., 138, presented this question to the Court of Errors of this State, and that Court therein made its decision.

The case of *Furman* vs. *Nichol* presented the same question to the Supreme Court, and that Court therein made its decision, and in that decision declared the law otherwise than as laid down in this case.—8 Wall., 44.

This case, therefore, is not presented lightly to the notice of the Court; for in the decision of the Supreme Court of the United States, ultimate and final jurisdiction of the contract and of its violation, as alleged, is assumed. "This Court," said the Supreme Court of the United States, " decides for itself, whether the construction which the Court below gave to these different statutes was correct or incorrect." The statutes referred to are those " which are claimed as proving the making of the contract, and its violation." " To do otherwise would be to surrender to the State Courts an important trust confided to this Court by the Constitution."

The ground taken in the return is that taken by the Court of Errors. And it plainly assumes that there must be not only a legal obligation to that effect, but also a present and immediate convertibility of these notes into coin, to make them a tender in payment of taxes.

That such a construction of this Section is erroneous, will appear by a reference to the decision of the Supreme Court as to the proper construction of this guarantee; by a reference to the circumstances under which the bills of this bank have been always received for taxes; and by the legislation of this State which estops it from such construction.—*Furman* vs. *Nichol.*

(1.) The construction given by the Supreme Court of the United States will be seen at pp. 59, 60, of 8 Wallace. It is that such a provision in the Section creates a contract with the holder which binds the State; which has for its object the creation of a wide confidence; inducing extended circulation of the bills of the bank, in which the State, through the bank, receives profit.

The construction by the State Court (of Errors), although it (15 Rich., 138,) admits that there is a contract, denies that it creates a guarantee; and adds nothing to any increase of public confidence, because it does not protect the holder in case of any financial embarrassment in the bank. The circumstance, therefore, which the Supreme Court of the United States, (8 Wall., 44,) said was the occasion for the guarantee, and the circumstance which it was intended to prevent—in times of financial embarrassment of the bank, causing a diminution of confidence in the bank and depreciation of its bills—are the very things which, in the judgment of the Court of Errors, makes the contract inoperative.

Of course it will be too apparent that if the contract, admitted to be such, be correctly interpreted by the Court of Errors, it does not deserve to be called a contract; for it would amount to little more than promoting, in the slightest degree, the mere convenience of the holder.

2. But what makes the objection so remarkable, is, that at two distinct periods in the history of the bank, the State recognized the obligation which it now denies.

In 1812, when the State chartered this bank, its capital consisted only of stocks, "without a dollar of specie." At this time all the banks in the Union were suspended, and the credit of the bank rested on the faith of the State to support it. Its notes or bills went into circulation when the bank was born in a state of suspension.— *State* vs. *Bk. So. Ca.,* 1 Spears, 484.

In 1857, when all the banks were in a state of suspension, the State again expressly recognized its obligation. (12 Stat., 596.) It is not necessary here to reply to the argument pressed in the Court of Errors that this Act of 1857 expired because not re-enacted. It has been from that day until 1865 unrepealed.

3. We pass now to the Legislature, which we say estops the State from such objection as it now makes. In 1857, in legislating upon the subject of banks, the Legislature defined what it meant by a bank bill. And although, for the purposes of the Act, this definition was given, and is not altogether accurate, it may be introduced here: "'Bank note' shall include all bills, notes, checks, or other obligations of any bank, made payable to bearer, *on demand*, or in any form whatever, written, printed, or engraved, so as to be circulated and used as *paper currency or money;* and 'bank of issue' to include every bank having lawful authority to issue its own bank notes."— A. A. 1857, Sec. 6, 12 Stat., 632.

It will be observed that in this description or definition of a bank bill or note, nothing is said of gold or silver. A bank bill is in its nature an obligation to pay gold or silver. The Act of 1863, which allowed the bank to make a special issue, payable in Confederate money, was altogether special; and the distinct mode of redemption is of itself the evidence of the intended obligation.

For the general characteristics of a bank bill, refer to Morse on Banks, 394, 396; *Miller* vs. *Race*, 1 Burr R., 456; *U. S.* vs. *Bank of Georgia*, 10 Wheat. R., 347.

In *Suffolk Bank* vs. *Lincoln*, 3 Mason, 1, Judge Story says: "It is the duty of every bank to pay its bills in specie on demand, if such demand is made at the bank within the usual banking hours." *The State* vs. *Bank of South Carolina*, 1 Spears, 399, 433, 436.

So clear is the recognition of the legal obligation of a bill of a bank, that in this State it has been held that a suspension of specie payments is cause of forfeiture of charter.—*The State* vs. *Bank of State of South Carolina*, 1 Spears, 399.

Now the bank bill of 1861, 1862, is in no wise different from the bank bill of 1850, or 1840. There is no qualification or condition annexed to the promise.

It is, then, a promise to pay in gold or silver. Such is its legal obligation while it is a bank.—*Thorington* vs. *Smith*, 8 Wall., 12.

"It expresses nothing but the corporate engagement to pay a certain sum. Its payment on demand is not indispensable; it would be always implied."—Morse, 395.

But it will be said the suspension was notice that such bills were not "originally made payable," nor would they, on demand, "become payable in gold or silver."

The suspension was not, in fact, insolvency; not so professed by the bank; not so accepted by the State.

1. In 1857 the State expressly directed these bills to be received, (12 Stat., 596.)

2. The State did not vacate the charter; but, on the contrary, legalized the suspension and re-affirmed the charter. "A declaration by the Legislature that the corporation shall continue, or a subsequent Act of the Legislature, recognizing the existence of a corporation, is a waiver of the forfeiture."

*State* vs. *Bank of Charleston*, 2 McM., p. 628; *People* vs. *Manhattan Co.*, 9 Wendell, 351.

But, in cases of suspension, the State had in previous years laid down a rule for itself, and also for the banks. In the Act of 1840 it had condoned the offence, and for a stipulated money-penalty relieved the bank from forfeiture of its charter, (11 Stat., 100.)

What charter was so preserved? What charter could it be but that of 1812? See the Act of 1843, (11 Stat., 250,) in which it is expressly declared that if a bank shall suspend, not having accepted the Act of 1840, (11 Stat., 100,) it shall vacate its charter. It is true that, by the Act of 1840, the State might, as it did, estop itself from all complaint; but although it could bring to bear upon the holder of the bills a very great moral pressure, it could not affect his right to enforce his bill according to its legal obligation.

But the State did much more than this.

In 1860 the State suspended, and, by other enactments, continued until the close of the war the suspension of various provisions in the Act of 1857 and 1858, the 2d Section of the Act of 1840, and the 5th Section of the Act of 1852.

And, finally, the Act of 17th December, 1863, 2d Section, declared that the indulgence in these suspensions should not be enjoyed by any bank which shall declare or pay dividends in gold or silver coin, or shall sell or dispose of its gold or silver coin, except to the State or the Confederate States.

Thus, by this sweeping enactment, did the State absolutely forbid the redemption of every obligation of the bank in gold or silver.

Thus, then, we have the indulgence of the State, for pecuniary considerations, given to those banks for their suspension; that sus-

pension afterwards allowed with a remission of the·penalty; that followed by a forfeiture of charter, if they or any of them did sell or dispose of their gold or silver, except to itself; and then, because of these things done with its acquiesence, and ultimately with its command, it claims that, because of these, its obligation as a guarantor is discharged. In other words, we have this proposition presented: 1st. The guarantor, for an equivalent in money, consents to the principal postponing the recognition of a legal liability. 2d. The guarantor forces the principal to a postponement of the legal obligation of his contract, and then claims that, because of those acts of the principal, the obligation of the guarantor is discharged.

If, then, the present practical unconvertibility of the bills of this bank be an act to which the State has been, as a guarantor, assenting, it can no more take advantage of that, to discharge its obligation, than could the bank to deny its obligation to the holder.— Morse, 397.

The Court will not fail to perceive that when the State consented to the continued exercise by this bank of its corporate powers, it, in that, sustained the credit of the bank. A refusal to pay in specie is not that proof of insolvency which prevents a subsequent bona fide holder of bills from a right set off. And surely no higher evidence could be given, by the State, of the solvency of the bank than the continuance of it as the fiscal agent of the State, according to the terms and conditions of its charter. And, in addition to this, one of the objects of the guarantee was to prevent the holder of the bills from drawing coin from the bank, by making that bill receivable for taxes and debts due to the State. On these grounds, we submit that the first of the objections presented in the return cannot be sustained.

The second objection is that the 16th Section of the Act of 1812 is repealed by the Act of 1843.

Before that ground is considered it is proper for the Court to give proper weight to so much of the judgment of the Court of Errors as impeaches these bills because they are worthless, and, therefore, rejects them.

It is obvious, at a glance, that, in an objection on this ground, it is assumed that the State qualifies its guaranty, so far as the payment of taxes is concerned, by a condition that they shall not be worthless. The State first repudiates its guaranty—because of which the bills became worthless—and then justifies the repudiation because they are worthless.

35A

of the 14th December, 1870, declared that the circumstances under which the bills were issued (referring to the new bills, or those issued by the bank subsequent to December, 1860,) were issues of fact, which must be decided. Under the order of the Supreme Court the case was sent back to the Court of Common Pleas of the 1st Circuit, and the verdict of the Jury is certified back to this Court, establishing the fact that the bills which were tendered, in the case of *Wagner* vs. *Stoll*, were the bills of the Bank of the State, and that such bills were not issued in aid of the rebellion, and in order to furnish means for resisting the arms of the United States in supporting said rebellion.

With this verdict it would seem, therefore, that the bills issued in 1861 and 1862, are entitled to stand, in all respects, upon an equal footing with the bills issued prior to December, 1860. .

It is conceded that the Government of the United States might have declared that no contract, public or private, between December, 1860, and April, 1865, should have force and effect.

It has not so done—thanks that it has not. It has said such only, whether public or private, shall be void which were made to aid the rebellion.

The question, therefore, in all such cases, is partly of fact, partly of law. The proof of the circumstances under which the contract was made has been submitted to the jury, and the verdict certified to the Supreme Court has established the fact that these bills were not issued in aid of the rebellion.

The issue of these bills by the bank was in the exercise of a lawful power.

The issue of its bills by the bank was a lawful act, done under its charter. The issue created a private contract, to which the guarantee of the State was as binding as would have been that of a private person. The purpose was relief. It was like the issue of its bills by the City Council of Charleston. And the City Council could as well have said to the holder of its bills that they created no legal obligation, as could the bank from which they were issued, or the State, as the guarantor, deny a liability for these bills.

The case of *Morgan* vs. *Keenan*, decided by this Court, gives us a rule in which is the first test to be applied in these cases.

The spirit of that decision is seen also in the case of the *State of Texas* vs. *White*, and in *Thorington* vs. *Smith*, where the Supreme Court was called on to enforce a contract made in Confederate

pension afterwards allowed with a remission of the penalty; that followed by a forfeiture of charter, if they or any of them did sell or dispose of their gold or silver, except to itself; and then, because of these things done with its acquiesence, and ultimately with its command, it claims that, because of these, its obligation as a guarantor is discharged. In other words, we have this proposition presented: 1st. The guarantor, for an equivalent in money, consents to the principal postponing the recognition of a legal liability. 2d. The guarantor forces the principal to a postponement of the legal obligation of his contract, and then claims that, because of those acts of the principal, the obligation of the guarantor is discharged.

If, then, the present practical unconvertibility of the bills of this bank be an act to which the State has been, as a guarantor, assenting, it can no more take advantage of that, to discharge its obligation, than could the bank to deny its obligation to the holder.— Morse, 397.

The Court will not fail to perceive that when the State consented to the continued exercise by this bank of its corporate powers, it, in that, sustained the credit of the bank. A refusal to pay in specie is not that proof of insolvency which prevents a subsequent *bona fide* holder of bills from a right set off. And surely no higher evidence could be given, by the State, of the solvency of the bank than the continuance of it as the fiscal agent of the State, according to the terms and conditions of its charter. And, in addition to this, one of the objects of the guarantee was to prevent the holder of the bills from drawing coin from the bank, by making that bill receivable for taxes and debts due to the State. On these grounds, we submit that the first of the objections presented in the return cannot be sustained.

The second objection is that the 16th Section of the Act of 1812 is repealed by the Act of 1843.

Before that ground is considered it is proper for the Court to give proper weight to so much of the judgment of the Court of Errors as impeaches these bills because they are worthless, and, therefore, rejects them.

It is obvious, at a glance, that, in an objection on this ground, it is assumed that the State qualifies its guaranty, so far as the payment of taxes is concerned, by a condition that they shall not be worthless. The State first repudiates its guaranty—because of which the bills became worthless—and then justifies the repudiation because they are worthless.

35A

of the 14th December, 1870, declared that the circumstances un-
der which the bills were issued (referring to the new bills, or those
issued by the bank subsequent to December, 1860,) were issues of
fact, which must be decided. Under the order of the Supreme
Court the case was sent back to the Court of Common Pleas of
the 1st Circuit, and the verdict of the Jury is certified back to
this Court, establishing the fact that the bills which were ten-
dered, in the case of *Wagner* vs. *Stoll,* were the bills of the Bank of
the State, and that such bills were not issued in aid of the re-
bellion, and in order to furnish means for resisting the arms of the
United States in supporting said rebellion.

With this verdict it would seem, therefore, that the bills issued
in 1861 and 1862, are entitled to stand, in all respects, upon an equal
footing with the bills issued prior to December, 1860.

It is conceded that the Government of the United States might
have declared that no contract, public or private, between Decem-
ber, 1860, and April, 1865, should have force and effect.

It has not so done—thanks that it has not. It has said such
only, whether public or private, shall be void which were made to
aid the rebellion.

The question, therefore, in all such cases, is partly of fact, partly
of law. The proof of the circumstances under which the contract
was made has been submitted to the jury, and the verdict certi-
fied to the Supreme Court has established the fact that these bills
were not issued in aid of the rebellion.

The issue of these bills by the bank was in the exercise of a
lawful power.

The issue of its bills by the bank was a lawful act, done under
its charter. The issue created a private contract, to which the
guarantee of the State was as binding as would have been that
of a private person. The purpose was relief. It was like the issue
of its bills by the City Council of Charleston. And the City
Council could as well have said to the holder of its bills that they
created no legal obligation, as could the bank from which they were
issued, or the State, as the guarantor, deny a liability for these
bills.

The case of *Morgan* vs. *Keenan,* decided by this Court, gives us a
rule in which is the first test to be applied in these cases.

The spirit of that decision is seen also in the case of the *State of
Texas* vs. *White,* and in *Thorington* vs. *Smith,* where the Supreme
Court was called on to enforce a contract made in Confederate

Treasury notes. Now, these notes, said the Court, were issued to further an unlawful attempt to overthrow the government. " No contracts made in aid of such an attempt can be enforced." " But was the contract of the parties to this suit a contract of that character? Can it be fairly described as a contract in aid of the rebellion ?"

In the same connection may be mentioned the case of the city of Richmond, as decided by Chief Justice Chase. In that case said the Chief Justice, " The controlling question in the case is, for what purpose were these notes issued ?"—2 Law Times, U. S. Court Reports, 101. " The evidence shows a very leading object was to give aid and support to the rebellion." And the same principle is well set forth in *Hatch* vs. *Burroughs*, Mss. C. C., Geo.

There, then, cannot remain, on this score, the slightest exception to these bills as in violation of the 14th Amendment. No rule for the construction of statutes would bring this case within the letter or the spirit of the Amendment of the Constitution of the United States.

The last objection is that the receipt of these bills is prohibited by the State.

What has been said in regard to the 14th Amendment is so applicable to this point that it need not be repeated.

*Chamberlain,* Attorney General, and *Corbin,* for respondent:

We take three main positions in this argument against the obligation of the State to receive the bills tendered by these relators in payment of their taxes to the State:

1st. That no such obligation exists on the part of the State, no contract having ever been entered into by the State to receive the said bills any longer than they are "payable in gold or silver coin," and that the bills now tendered are notoriously *not* "payable in gold or silver coin."

2d. That whatever the nature or effect of the language of the 16th Section of the Act of 1812, incorporating the Bank of the State, that Section was repealed by the Act of 1843, which directed "that all taxes for the use and service of this State shall be paid in specie, paper medium, or the notes of *specie paying* banks of this State."

3d. That the State is not in any view compellable to receive these bills in payment of taxes, by *mandamus,* to the County Treasurer.

1st. The claim now made by the relator is, that the 16th Section

Here we have a general and absolute rule, adopted by the State·
The bills, in order to be receivable, must be the bills of banks pay-
ing specie for their bills when presented for payment.

Certainly all bills issued since the passage of this Act are receiva-
ble only upon the express condition that the bank issuing them
shall redeem them in specie.

In support of these positions we refer your Honors especially to
the case of *Woodruff* vs. *Trapnall,* 10 How., 190; and also to the
case of the *Graniteville Manufacturing Co.* vs. *Roper,* 15 Rich.,
138.

*Woodruff* vs. *Trapnall* was an action brought by the State of
Arkansas against the plaintiff in error and his sureties upon his
official bond, as Treasurer of the State, for the recovery of a certain
sum of money alleged to have been received by him, as Treasurer,
between the year 1836 and 1838. Judgment was recovered, and
execution issued, whereupon the plaintiff in error tendered the full
amount of ·the judgment in the notes of the Bank of the State of
Arkansas, which were refused.· A petition for a *mandamus* was
asked for, to compel the defendant in error to receive the said bank
notes in satisfaction of the judgment.

The 28th Section of the Bank Charter provided " that the bills
and notes of said institution shall be received in all payments of
debts due to the State of Arkansas."

Nothing can be more striking than the difference between this
provision of the charter of the Bank of Arkansas, and the 16th
Section of the Charter of the Bank of this State. In the former
case, it is provided that the "bills and notes " shall " be received in
payment of all debts;" in the latter case there is a 'most important
and significant condition, or limitation, namely, "bills or notes "
originally made payable, or which shall become payable on demand,
in gold or silver coin.

The decision in *Woodruff* vs. *Trapnall,* that the contract was an
absolute one, requiring the State of Arkansas to receive all bills or
notes of the Bank of Arkansas in payment of dues to the State, is
by no means a decision that this State is bound to receive all the
bills or notes of the Bank of this State, inasmuch as the terms of the
charters are seen to be different in important particulars.

In this case the Court, while holding that the State was bound to
receive the bills or notes issued, while the 28th Section of the charter
was unrepealed, expressly recognizes the right of the State to repeal
the Section, and declares that after the repeal of the 28th Section,

Treasury notes. Now, these notes, said the Court, were issued to further an unlawful attempt to overthrow the government. "No contracts made in aid of such an attempt can be enforced." "But was the contract of the parties to this suit a contract of that character? Can it be fairly described as a contract in aid of the rebellion?"

In the same connection may be mentioned the case of the city of Richmond, as decided by Chief Justice Chase. In that case said the Chief Justice, "The controlling question in the case is, for what purpose were these notes issued?"—2 Law Times, U. S. Court Reports, 101. "The evidence shows a very leading object was to give aid and support to the rebellion." And the same principle is well set forth in *Hatch* vs. *Burroughs*, Mss. C. C., Geo.

There, then, cannot remain, on this score, the slightest exception to these bills as in violation of the 14th Amendment. No rule for the construction of statutes would bring this case within the letter or the spirit of the Amendment of the Constitution of the United States.

The last objection is that the receipt of these bills is prohibited by the State.

What has been said in regard to the 14th Amendment is so applicable to this point that it need not be repeated.

*Chamberlain*, Attorney General, and *Corbin*, for respondent:-

We take three main positions in this argument against the obligation of the State to receive the bills tendered by these relators in payment of their taxes to the State:

1st. That no such obligation exists on the part of the State, no contract having ever been entered into by the State to receive the said bills any longer than they are "payable in gold or silver coin," and that the bills now tendered are notoriously *not* "payable in gold or silver coin."

2d. That whatever the nature or effect of the language of the 16th Section of the Act of 1812, incorporating the Bank of the State, that Section was repealed by the Act of 1843, which directed "that all taxes for the use and service of this State shall be paid in specie, paper medium, or the notes of *specie paying* banks of this State."

3d. That the State is not in any view compellable to receive these bills in payment of taxes, by *mandamus*, to the County Treasurer.

1st. The claim now made by the relator is, that the 16th Section

Here we have a general and absolute rule, adopted by the State. The bills, in order to be receivable, must be the bills of banks paying specie for their bills when presented for payment.

Certainly all bills issued since the passage of this Act are receivable only upon the express condition that the bank issuing them shall redeem them in specie.

In support of these positions we refer your Honors especially to the case of *Woodruff* vs. *Trapnall*, 10 How., 190; and also to the case of the *Graniteville Manufacturing Co.* vs. *Roper*, 15 Rich., 138.

*Woodruff* vs. *Trapnall* was an action brought by the State of Arkansas against the plaintiff in error and his sureties upon his official bond, as Treasurer of the State, for the recovery of a certain sum of money alleged to have been received by him, as Treasurer, between the year 1836 and 1838. Judgment was recovered, and execution issued, whereupon the plaintiff in error tendered the full amount of the judgment in the notes of the Bank of the State of Arkansas, which were refused. A petition for a *mandamus* was asked for, to compel the defendant in error to receive the said bank notes in satisfaction of the judgment.

The 28th Section of the Bank Charter provided "that the bills and notes of said institution shall be received in all payments of debts due to the State of Arkansas."

Nothing can be more striking than the difference between this provision of the charter of the Bank of Arkansas, and the 16th Section of the Charter of the Bank of this State. In the former case, it is provided that the "bills and notes" shall "be received in payment of all debts;" in the latter case there is a most important and significant condition, or limitation, namely, "bills or notes" originally made payable, or which shall become payable on demand, in gold or silver coin.

The decision in *Woodruff* vs. *Trapnall*, that the contract was an absolute one, requiring the State of Arkansas to receive all bills or notes of the Bank of Arkansas in payment of dues to the State, is by no means a decision that this State is bound to receive all the bills or notes of the Bank of this State, inasmuch as the terms of the charters are seen to be different in important particulars.

In this case the Court, while holding that the State was bound to receive the bills or notes issued, while the 28th Section of the charter was unrepealed, expressly recognizes the right of the State to repeal the Section, and declares that after the repeal of the 28th Section,

"the emissions of the bank subsequently are without the guarantee."

The Act of 1843, above referred to, directing that all taxes for the use and service of the State shall be paid in specie, paper medium, or the notes of the specie paying banks of the State, was a virtual repeal of the 16th Section of the Act of 1812. And, although the Act of 1843 may be within the constitutional inhibition prohibiting a State from impairing the obligation of a contract, the prohibition can apply only to bills in circulation before the passage of the Act, to which time the guarantee of the State extended.

If, therefore, a tender is made of bills issued and in circulation after 1843, it would not be a compliance with the conditions prescribed by the "specie, paper medium, or the notes of the specie paying banks of the State." This point was made in *Woodruff* vs. *Trapnall*, and the Court held that "the notes issued by the bank after the repeal were not within the contract, and might be refused by the State."—*Graniteville Man. Co.* vs. *Roper*, 14 Rich., 138.

Our conclusion, therefore, is that if the 16th Section of the charter of this bank created an absolute contract, as claimed by the appellants, between the bill holders and the State, requiring the State to receive all the bills of the bank, whether payable or not in gold or silver, this contract was terminated by the repeal of that Section by the Act of 1843.

Third. But waiving the former question, or even admitting the contract as claimed by the relators, the County Treasurer, as a tax officer of the State, cannot be compelled by *mandamus* to receive these bills.

We have in our own State Reports one case which conclusively bars this proceeding—the case of the *State Ex. Rel. Hunt* vs. *Pinckney, Tax Collector.*—3 Strobhart, 400.

This is a case exactly applicable to the present case. It was an application for a *mandamus* to compel the Tax Collector to receive. "special indents" in payment of taxes. Special indents were, by a former law, made receivable for taxes.

The Court in that case uses the following language: "It is not material to the decision of this motion, that the validity and justice of the relator's claim should be investigated, by reference to the terms of credit on which special indents were received by the public creditors, or the provision made for the payment of them by the several Acts under which they were issued, or by the application of the presumptions of law and fact against the relator's right, arising

the United States in *Furman* vs. *Nichol*, 8 Wall., 44, to the extent of holding that the bills and notes of the said corporation, issued before the repeal of the said Section, are receivable in the payment of taxes. The language of the Tennessee Act and our own, as to the right of the tax, or State debtor to make payment in such bills, is identical. The decision of that Court on the constitutionality of a State law is binding on the Courts of the States, and it is to be accepted as the final arbitrament of the question involved. So far, therefore, as *Furman* vs. *Nichol* holds that a legal obligation rested on the State of Tennessee to receive in payment of taxes the bills of its State bank, issued before the repeal of its charter, whether such bills are capable or not of immediate convertibility into specie, we are to acknowledge it, in this particular, as the law of the land, binding on us, although in conflict with the decision of our late Court of Errors, in respect to the 16th Section of the Act "to establish a bank on behalf of and for the benefit of the State."

Another proposition, however, remains to be considered, which we do not regard as affected by the decision in *Furman* vs. *Nichol.* Though the guaranty of the State of Tennessee was held to attach to the bills issued by its bank until the Legislature, in some proper way, had notified the public that it was withdrawn, it was for the Court, in that case, to determine when the contract ceased to be binding by reason of the character of the notice given by the State, that no such guaranty should attach to the bills which might thereafter issue. There the Court held that the statute on which the State relied was not sufficient to establish a repeal of the Act. Here we are at liberty to consider and decide that question for ourselves. The course and effect of the legislation which induce us to hold that the 16th Section of the Act of 1812 was repealed, are of a different character from that which, in the case referred to, led the Court to conclude that the 12th Section of the Tennessee Act remained unimpaired.

The judgment of the Court in *The Graniteville Manufacturing Company* vs. *Roper, Tax Collector*, 15 Rich., 138, did not rest alone on the availability of the bills tendered, for immediate conversion into gold and silver coin. Even assuming that its construction of the said Section was wrong in this regard, yet it brought itself within the exemption laid down in *Trapnell* vs. *Woodruff*, 10 How., 206, (and since recognized in *Furman* vs. *Nichol*,) by showing that the bills tendered were issued after the repeal of the Section. The bills offered there, as well as here, were issued after 1843, and we

"the emissions of the bank subsequently are without the guarantee."

The Act of 1843, above referred to, directing that all taxes for the use and service of the State shall be paid in specie, paper medium, or the notes of the specie paying banks of the State, was a virtual repeal of the 16th Section of the Act of 1812. And, although the Act of 1843 may be within the constitutional inhibition prohibiting a State from impairing the obligation of a contract, the prohibition can apply only to bills in circulation before the passage of the Act, to which time the guarantee of the State extended.

If, therefore, a tender is made of bills issued and in circulation after 1843, it would not be a compliance with the conditions prescribed by the "specie, paper medium, or the notes of the specie paying banks of the State." This point was made in *Woodruff* vs. *Trapnall*, and the Court held that "the notes issued by the bank after the repeal were not within the contract, and might be refused by the State."—*Graniteville Man. Co.* vs. *Roper*, 14 Rich., 138.

Our conclusion, therefore, is that if the 16th Section of the charter of this bank created an absolute contract, as claimed by the appellants, between the bill holders and the State, requiring the State to receive all the bills of the bank, whether payable or not in gold or silver, this contract was terminated by the repeal of that Section by the Act of 1843.

Third. But waiving the former question, or even admitting the contract as claimed by the relators, the County Treasurer, as a tax officer of the State, cannot be compelled by *mandamus* to receive these bills.

We have in our own State Reports one case which conclusively bars this proceeding—the case of the *State Ex. Rel. Hunt* vs. *Pinckney, Tax Collector.*—3 Strobhart, 400.

This is a case exactly applicable to the present case. It was an application for a *mandamus* to compel the Tax Collector to receive "special indents" in payment of taxes. Special indents were, by a former law, made receivable for taxes.

The Court in that case uses the following language: "It is not material to the decision of this motion, that the validity and justice of the relator's claim should be investigated, by reference to the terms of credit on which special indents were received by the public creditors, or the provision made for the payment of them by the several Acts under which they were issued, or by the application of the presumptions of law and fact against the relator's right, arising

the United States in *Furman* vs. *Nichol*, 8 Wall., 44, to the extent of holding that the bills and notes of the said corporation, issued before the repeal of the said Section, are receivable in the payment of taxes. The language of the Tennessee Act and our own, as to the right of the tax, or State debtor to make payment in such bills, is identical. The decision of that Court on the constitutionality of a State law is binding on the Courts of the States, and it is to be accepted as the final arbitrament of the question involved. So far, therefore, as *Furman* vs. *Nichol* holds that a legal obligation rested on the State of Tennessee to receive in payment of taxes the bills of its State bank, issued before the repeal of its charter, whether such bills are capable or not of immediate convertibility into specie, we are to acknowledge it, in this particular, as the law of the land, binding on us, although in conflict with the decision of our late Court of Errors, in respect to the 16th Section of the Act "to establish a bank on behalf of and for the benefit of the State."

Another proposition, however, remains to be considered, which we do not regard as affected by the decision in *Furman* vs. *Nichol*. Though the guaranty of the State of Tennessee was held to attach to the bills issued by its bank until the Legislature, in some proper way, had notified the public that it was withdrawn, it was for the Court, in that case, to determine when the contract ceased to be binding by reason of the character of the notice given by the State, that no such guaranty should attach to the bills which might thereafter issue. There the Court held that the statute on which the State relied was not sufficient to establish a repeal of the Act. Here we are at liberty to consider and decide that question for ourselves. The course and effect of the legislation which induce us to hold that the 16th Section of the Act of 1812 was repealed, are of a different character from that which, in the case referred to, led the Court to conclude that the 12th Section of the Tennessee Act remained unimpaired.

The judgment of the Court in *The Graniteville Manufacturing Company* vs. *Roper, Tax Collector*, 15 Rich., 138, did not rest alone on the availability of the bills tendered, for immediate conversion into gold and silver coin. Even assuming that its construction of the said Section was wrong in this regard, yet it brought itself within the exemption laid down in *Trapnell* vs. *Woodruff*, 10 How., 206, (and since recognized in *Furman* vs. *Nichol*,) by showing that the bills tendered were issued after the repeal of the Section. The bills offered there, as well as here, were issued after 1843, and we

concur in the conclusion of the Court of Errors in that case, "that although the Act of 1843 may be within the constitutional inhibition prohibiting a State from impairing the obligation of a contract, the prohibition can only apply to bills in circulation before the passage of the Act."

Although "Courts do not favor repeals by implication," yet if, by a fair and necessary implication, the intention of the Legislature is apparent, though not expressed in direct and positive terms, that subsequent provisions are to abrogate· those already existing, such effect will be given to them as will carry out the proposed purpose. If there is a repugnancy created between two Acts, which cannot be reconciled, the latter is to be construed as repealing the former. If such a construction can be given each as will permit them to stand together, they will both be regarded of force. It is not necessary that the subsequent statute, which is relied on as that which creates the repeal, should be in direct repugnance to all the purposes contemplated by the prior one, if it is obvious that it intended to fix the rule which was thenceforward to govern in the matter to which it was to be applied.—*Davies* vs. *Fairbanks*, 3 How., 636.

The Act of ·1843, (11 Stat., 246,) entitled "An Act prescribing the duties of certain officers in the collection of supplies, the payment of salaries, and for other purposes," directed "that all taxes for the use and service of this State shall be paid in specie, paper medium, or the notes of specie paying banks of this State."

The Act was a general one, not confined to a particular period. Its design was to qualify the obligation which rested on the State to accept, under all circumstances, in payment of dues, not only the notes of the Bank of the State of South Carolina, but of all such other banks as, under their respective charters and various provisions of the annual supply Acts, had the right to demand that their bills should be so received. The Legislature had, from time to time, in the Acts passed annually to raise supplies for the current fiscal year, prescribed the medium· in which the taxes for such year should be paid. The Act of 1843 was a general one, and intended to be permanent in its operation, subject· to any exception which the General Assembly might make for any particular year. It regulated the mode in which the taxes were to be paid by directing that they "shall be paid in specie, paper medium, or the notes of the specie paying banks of this State." The words employed to denote the purpose of the State were not only decisive, but imperative. The notes ·tendered by the relator were not of any specie

Directors of the Bank of the State of South Carolina constituted a contract between the State and the holders of the notes of the bank, which the State was not at liberty to break, and tender of notes issued prior to the repealing Act was good.

2. That the notes of the said bank, tendered by the relator, were such notes of the said bank as the State, by the 16th Section of the charter of the bank, had declared should be received in payment of taxes.

3. That at the time of the issue of the notes of the bank tendered by the relator, no Act of the Legislature of the State had repealed the 16th Section of the Act of 1812, the charter of the said bank.

4. That the notes of the President and Directors of the Bank of the State of South Carolina, issued by the said bank prior to December 20, 1860, were good as a tender to the County Treasurer in payment of taxes due to the State.

5. That *mandamus* is the proper remedy for the relator in this case to enforce upon the County Treasurer such notes in payment of taxes.

6. Because His Honor, the presiding Judge, should have made the rule absolute, and ordered the *mandamus* to issue as prayed for.

*Magrath & Lowndes*, for appellants.

*Chamberlain & Corbin*, contra.

Aug. 9, 1871. The opinion of the Court was delivered by

Moses, C. J. The suggestion filed by the relator does not aver that the bills of the Bank of the State tendered to the respondent, the Treasurer of Charleston County, in the payment of taxes, were issued prior to the 19th day of December, 1843, on which day the Act "prescribing the duties of certain officers in the collection of supplies, the payment of salaries, and for other purposes," was passed.—11 Stat., 246. The case was taken up with that of the *State Ex Rel. Wagner* vs. *Stoll*, and argued together by the same counsel for the appellants, on the same grounds, and on the assumption that the bills tendered in both cases were issued by the bank after the passage of the said Act.

It is, therefore, identical in principle with the said case of *Wagner* vs. *Stoll*, and it is unnecessary to repeat the reasons assigned in that case for the judgment of the Court here, which judgment has been already filed.

*Willard*, A. J., and *Wright*, A. J., concurred.